Good morning and welcome to the Ninth Circuit. I'm Judge Nelson and it's a pleasure to be joined by my colleagues, Judge Hawkins and Judge Wallach, visiting from Washington, D.C. in the Federal Circuit. We'd like to welcome counsel and we want to thank court staff for – they've been so good at getting this week done efficiently and without hiccup, which is always a good thing. We ask that during arguments you just watch your time, tell us if you want to reserve any time for rebuttal and try and sum up. We have two cases set for argument this morning and so we'll go ahead and proceed with the first case set for argument, which is Manygoats v. United States Office of Navajo and Hopi Indian Relocation, which is case number 24-3274. We'll start with Mr. Phillips. Good morning, Your Honors. Lee Phillips on behalf of the Manygoats family, primarily Charlie and his wife, Elsie. If you allow me to give you just a little context or background, we're talking about now 1970s, 1974, United States Congress passes the Navajo-Hopi Indian Land Settlement Act, designed to try to settle conflicts between primarily the Hopi tribe, the smaller tribe, or farmers. Navajo is a larger tribe. At least two of us up here have heard several of these cases and I was born and raised in Winslow, Arizona, so you don't need to tell me anything about the Navajo. I'm from Superior. I'm aware of that, gentlemen. Mr. Nelson, I don't believe, has any Arizona connections. But he's had these cases before. Okay. And I understand the last time I was speaking to you, Judge Hawkins, you asked about my client's clan, so I just want to let you know my client, all of my clients in the family don't speak any English, didn't speak any English, and so we never had the opportunity to communicate other than through interpreters, so I'm not aware of the paternal or maternal clans of the Manygoats. Judge, just be, again, I think you are aware, I know you are aware, but just to keep in mind, the Navajos are largely ranchers. They live in isolated extended family units. The Hopis are completely the opposite. They are a Pueblo tribe and they live in villages. So the Hopis are clustered in an area that's now the Hopi Reservation, primarily three mesas, which contain a number of Hopi villages. The Navajo surrounded that group of Hopi and they were, as I say, out in like isolated ranch areas. They were cowboys. Counsel, if I could focus in on the case a little bit, you know, I mean, obviously there are some unique aspects to the Indian law portion of this, but at the end of the day, this is really an agency review, isn't it? I mean, aren't we looking at this and reviewing it for substantial evidence? Yes. And so maybe you could deal with it. I mean, obviously that's a pretty heavy, heavy burden for you and your clients. And maybe you could walk through and say, you know, explain why you think there was no substantial evidence. Because as I read this record, there's a lot of things going this way and that way, but that's exactly what the substantial evidence standard is designed to protect against is when you have a lot of conflicting evidence in the record, you know, the fact finder and adjudicator is usually given a lot of deference. I understand. Now, since it's a de novo review in terms of the legal issues. In your opening brief, you argued that the hearing officer should have considered extra record evidence in its decision, namely for prior hearing officer decisions. Were they ever provided in the administrative record? I don't see them. I believe that they were the ones that we submitted. But again, I don't think that that's really the important issue. I'd like to focus the court on my substantial evidence. I'd like to just go forward if I could. Here's what's important. Answering the judge's question. Yes, sir. And do you remember the question he asked? Yes. Can you answer it? I'm sorry. I Mr. Murkow had conducted in other cases that we had submitted as evidence to show that they in this case he had varied or chosen. Where were they in the administrative record? I'm sorry. Where were those decisions in the administrative record? They would have been attached to our originally to our motions for summary judgment. That would be in the addendum in the excerpt of record. But again, I don't expect to address those issues in particular, but I'm happy to if you have questions. But what I'd like to again, so in brief, you say John Lee's testimony regarding his personal knowledge is to Mr. You come, Charlie, Mr. Many goes presence at his HPL home site in the early 70s was completely ignored. But you don't offer any record citation to substantiate that. Can you can you substantiate that it was completely ignored? Yes, your honor. If by me, the we're dealing with administrative agency decisions, of course. And so in this case, we have one hearing officer who's been the only hearing officer for over 40 years. Every decision has been Mr. Murkowski. In this situation, we are talking. We're talking about family, many goats who are living in what's called Black Mesa, which is the highly elevated area. And that was part of the joint use area, which was basically areas established for both use, Navajo and Hopi. And then they also, like most Navajo tribe, tribal members had a second seasonal home, which is typically referred to as a summer home that normally would be in the lower elevation. There would be flatter typically in that area would be like in this case would be Cal Springs for my clients. They had a farm there. They didn't have a residence there, but they had a farm there. They would go in the spring to plant and they would go back in the fall to harvest. But by and large, they always lived in the up in Black Mesa and in a smaller remote canyon called Porcupine Canyon, which through a wash in the rainy season, basically flooded the area. It was the only access to the home site. The family, just as I could, John Lee is the uncle of my client, Charlie. His father, Charlie's father is Red. That would be John Lee's brother. John Lee had, I'm sorry, Red had two wives, Kate, who was my client, Charlie, many goats mother. And he had a second wife who was her sister, Lucy. And so that they lived in a one particular area at the bottom of this canyon. The May Homer was his older sister, Charlie's older sister. When she got married, she moved out of the canyon up to the top of the Mesa with her husband. So she was two miles away up top. His uncle, John Lee was still living down there. You're saying your version of the facts, but it's not necessarily accepted by the hearing office. Well, let me ask if I could say, John Lee was his uncle. John Lee, like Charlie and Red, spoke no English, no education. And so they basically were farmers and ranchers. John Lee had his own hearing two years separate from my client, Charlie. In John Lee's hearing, Officer Murkow found Mr. Lee, his uncle, to be completely credible. And he reversed the agency's decision to deny John Lee. And in fact, John Lee was certified, even though I like like Charlie and his dad identical. No, not listed on the enumeration, which is ideal. Is it possible that a finder of fact can hear a witness two different times and find they're credible in one instance and not credible in another instance? I think that is possible. But you're speaking about the same issues, same time frame, locations, everything. It'd be unlikely that they would differ very much. And so John Lee was found credible. Charlie was a witness for John Lee at his hearing, and John Lee was a witness for Charlie at his hearing. The other witnesses were his wife, Elsie, and his older sister, May Homer, and his uncle, John Lee. The testimony basically, in this case, what I think is important is the folks living down in Porcupine Canyon, like many other Navajo families on the Hopi Partition lands, were in a remote area. No deliveries, no roads, nothing. And the only access, relocation acknowledges, is the wash, which half the time is running with water. So it's very, very isolated area. They're down below. And the enumeration, by and large, was on the surface of Banach Mesa. So there were a number of families, including John Lee, who had was living there, was certified there, but had no rest, no structures left. There was no history of him being there until he had his hearing in front of Judge Burkow. Charlie would be the same situation. Charlie was living in the bottom of the canyon. He's the only son, which is important because in the Navajo culture, it's critical for the men, young men particularly, to take care of the livestock. And so he had five sisters, but he was the only son. So he bore the responsibility of almost all the daily chores in terms of livestock farming, etc. He had a second, his farm, as I said, was in Cow Springs. Cow Springs was also where Elsie, many goats, was living. And at that time, they had not known each other. In fact, they didn't know each other until they were married, which was arranged marriage. So Charlie had his cart and field down where Elsie lived. They got married. And at that time, by and large, because of the construction freeze and because of the limitations... Counsel, doesn't this case sort of depend on whether they had an established residence at a particular place? Isn't that what this boils down to? Well, yeah, it boils down to they have to show that in 1974, they resided on the HPL. Right. And between then and 1986... And I thought the hearing officer said that when they went and where they said that they had lived and resided during that time, there was no evidence of prior habitation there. I'm sorry, Judge, but that's not correct. Okay. When Mr. Shelton, who... Wait, it's not correct that that's what the hearing officer said, or it's not correct that those are the facts? Not correct that those are the facts. Okay. Joe Shelton was the person who went out always to inspect these homes. He was a Navajo person. Here's my question. I know that's subversion, but how are we supposed to determine that? What are we supposed to... How do we analyze this in a way to say your facts are correct and they have to be correct? And the hearing officer was just mistaken. I mean, is there something in the record that says the hearing officer went here and looked at this area and said there was no evidence of and here's the evidence of habitation? Yes. Again, Joe Shelton, he was the one who investigated the home sites. He's the one who did the report about my client's home sites. He's the one that tells the court now through his reports that the inaccessible area, that he didn't even go down all the way because it was flooded. He did go and Charlie did show him, Charlie and Joe Shelton in his report said there were four home sites, two Hogan sites had no evidence, two Hogan sites had evidence including ash piles, which is basically left over from all the fire, et cetera, and the auto parts. Both John Lee had the same basic issue. They both had old auto parks at home areas, which looked like they were homes. And in fact, Mr. Shelton in his report says that there were four homes or how many homes there were. They were all destroyed, taken away, the materials by the Hopi tribe once they took occupancy of that area and my client vacated. So Joe Shelton says, and he also testified in John Lee's case, he also said there were no structures. He also said there were no, other than remnants, there was no other indication, but they found that based on the testimony of John Lee and Charlie and the other family members, that they did live there. In fact, it was well documented that they lived there for a number of years. Charlie, when Charlie started working, he commuted to Page from Black Mesa. When he was married to his wife, Elsie, she remained in Cal Springs with her family, her mother and her children, ultimately five children. And Charlie remained up in Black Mesa because he had to take care of his parents and his grandparents and their livestock. And so he commuted to Page during the week for work. And then he would come to every two weeks, he would come down to Cal Springs with his paycheck and he would spend time with his wife and children. So is the essence of your argument that the government can point to no difference at all between the evidence regarding Mr. Lee and the evidence regarding Mr. Manygoats? I'd say it's very, very similar, other than the judge made a decision. That's not my question. Okay, I'm sorry. If you repeat the question, I'll try to answer it directly. Is your argument that the government can point to no evidence showing a distinction between Mr. Lee and Mr. Manygoats habitation? Well, they lived close, but they lived separately, of course, Charlie. It's a yes or no. John Lee was an uncle much older. My client was at the next level family down. He was, he was no like Charlie and read no education, no English. And so all that Charlie had one year of my client, one year of education. So again, everything is done in Navajo, needed interpreters for everything. Counsel, do you want to reserve? You're down to one minute. Do you want to reserve for rebuttal? Yes, please. Okay, thank you. Good morning, Your Honors. And may it please the court, Caitlin Shugart-Schmidt here on behalf of O'Neill. You know, Your Honors here, as I think we've all sort of honed in on the hearing officer determined that Charlie Manygoats had not met his burden of proof to show that he resided on Hopi partition lands, specifically as of December 22, 1974. This court reviews that determination under the highly deferential substantial evidence standard. And accordingly, this court should uphold the denial of benefits. I'm happy to start with the last point that was just discussed, which is the difference, of course, between Charlie Manygoats' case and Mr. Lee's case. Of course, any case isn't binding on any particular case, you know, within the system. But I will say that, of course, there is a, on its face, very clear difference between the two, which was that in his uncle's case, John Lee was considered to have given credible testimony. And if he had given credible testimony about his nephew's location, that would have been something that even in Charlie's hearing, Charlie's counsel could have pointed to, right? And say, John Lee testified credibly a few years ago. In that testimony, he testified about where his nephew lived at that time. And that could have been used in this case. But it wasn't. And I think it's obvious that it wasn't, because that's not what the testimony said. And I suppose what's really important just at base here is the fact that we have a situation where, you know, pushing back a little bit on your earlier comment, Judge Nelson, I don't think that this is a case where there's a lot of evidence that goes either way. I actually think if you look down the full list of evidence, this is a case that leans very, very heavily, if not entirely, towards the idea that Charlie did not meet his burden of proof to show that he lived in this particular place. But I guess the point is that that's still reviewed for substantial evidence. So any evidence, I mean, there is some evidence. There's testimony. I think you've got to be fair. There's testimony here. But they didn't find it credible. And the standard, we're not re-adjudicating this. We're saying, is there any evidence? You're saying there's a lot of evidence. Maybe you're right. We don't even need to go that far, right? That's correct, Your Honor. I mean, I think it's here. It's not a question about whether there's no other plausible or, you know, the other version of the evidence has to be impossible or anything about in that realm. It's just the question of whether the hearing officer here reasonably looked at the evidence he had in front of him and made a supported determination by what is in front of him in the record in getting to that decision. John Lee, in his hearing, testified that he resided at the Mesa? That is my understanding, is that he testified that he resided in the Mesa. But at least I have not seen anything in any of the record that's been pointed to that said he testified, you know, that in 1974, his nephew was residing, you know, also in the Mesa. That was going to be my next question. Okay. Yeah. My understanding is there's nothing there. You know, and I will say, just sort of as a broad point, of course, you know, I think throughout the briefing and at argument today, there have been a lot of sort of assertions put forward about the nature of living arrangements at this time. But, you know, I would ask your honors to actually go back to the administrative record in this case and look at which of those statements are actually supported by items in the testimony or other affirmative evidence that was put forward. Did Charlie Many Goats, to the government's knowledge, have an enrollment card? I'm not aware. I do think that this is helpful in pointing the court. Your answer is you don't know. I don't know. Not that I have seen in the record. Not that I'm aware of. What I would ask your honors considers in the context of that question, too, is, of course, O'Neill's regulations here put forward a wide variety of sort of evidentiary documentation that someone could put forward that an applicant could put forward as part of their claim. And I think it's helpful here to not just look at, you know, what was put forward or what was testified to credibly or not, but also the absence of anything else that could have supported a claim that applicant would have entitled to put forward and chose not to. Do your honors have any other specific questions about portions of this case? I'm more than happy to discuss any of the issues, but I also want to be respectful of your time. No, I think we don't have any more questions. Thank you. Okay. Thank you, your honors. Your honors, the evidence will show, and Judge Burkow decided that my clients were both credible when they testified on all of their testimony, where they lived, what they did, except for the evidence that they testified to about their residency in the canyon. Both John Lee and his brother, Red, they lived in the canyon. The only one on the mesa is May Homer, and that's because she moved up there after she was married. So, all of my client's residence was in that canyon, and they had a farm in Cow Springs. My client married during a time when his family was restricted in construction, where they were living in Black Mesa. They couldn't build a home for him and his family, so she lived with her family, he lived with hers, until 1975, when he moved to White Mesa with his kids and his wife, and continued, because I was closer even to Page where he was working, there was no evidence at all, no testimony, no documentary evidence, no photographs, nothing that ever puts my client, Charlie Manigault, in Cow Springs, even overnight. There's never anybody who's ever said Charlie ever spent one night. He lived up in Black Mesa, traveled about seven miles to pick up his wife, brought the kids back so they could be with his family. He never once, no one testified that he ever lived in Cow Springs, so that's what I would say when I say there's no evidence. There's not a single witness. My witness... Counsel, we've got your argument, we've given you a little bit extra time here, so I think, do you have a concluding statement? One sentence. No evidence of residency in Cow Springs, all evidence is residence on Black Mesa HPL, just like John Lee. Okay, thank you. Thank you. Thank you to both counsel for your arguments in the case. The case is now submitted. We will move on to our second argument set for today, which is Ambrosio versus Progressive Preferred Insurance Company, case number 24-2708. Oh, you know what? We're going to take a short recess, and then we'll come back. We'll just take a two-minute recess. No, we'll go out.
judges: HAWKINS, Wallach, NELSON